Thelma DAVIS

v.

UNITED STATES STEEL SUPPLY, DI-
VISION OF UNITED STATES STEEL
CORPORATION, Appellant.

No. 80–2571.

United States Court of Appeals,
Third Circuit.

Argued May 18, 1981.

Resubmitted March 16, 1982.

Decided Aug. 30, 1982.

 

Robert X. Medonis (argued), Pittsburgh, Pa., for appellee.

Richard F. Lerach (argued), Pittsburgh, Pa., for appellant.

Argued May 18, 1981

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

Resubmitted March 16, 1982

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal from a district court judgment in favor of plaintiff Thelma Davis under 42 U.S.C. § 1981, United States Steel Corporation (U. S. Steel) raises a number of troublesome as well as important issues. Among these issues one question must, as a prerequisite to the adjudication of the remainder, take precedence: the res judicata effect upon this action of a prior Pennsylvania court judgment with respect to the allegedly discriminatory discharge of Thelma Davis by U. S. Steel. We conclude that further litigation of Davis' claim is barred by res judicata.

I

Thelma Davis, a black woman, commenced her employment with the Steel Supply Division of the United States Steel Corporation on May 5, 1966. She worked as a Flexograph operator and was the first black office employee of the Supply Division's Reedsdale Street location. She had been employed by U. S. Steel for almost four years when she was terminated on February 3, 1970.

During her tenure with U. S. Steel, Davis experienced difficulties with fellow employees. Tension developed between Davis and two other women employees in the Flexograph Room. At least one of these women complained to Boris Pishko, their immediate supervisor, that Davis was uncooperative.

Davis, in turn, submitted a letter to Beecher Taylor, Pishko's supervisor, complaining of numerous incidents involving co-workers. Some of these complaints were racial in nature. As a result of these and other actions, at Taylor's direction, Pishko talked to Davis and several other employees in an effort to restore office harmony.

These efforts were to no avail, at least so far as the Flexograph room was concerned, and in early 1969 Pishko moved Davis to the file room. The record is equivocal as to whether Davis' problems continued in this department. On the morning of February 3, 1970, however, Pishko, as a result of complaints made by co-workers, requested that Davis use less perfume on her person. Davis was offended by this request and complained to Paul Sykes, the acting district manager and Pishko's then supervisor. Later that day, Davis discovered that one of her boots was torn, and attributed that action to her fellow employees. She complained to Pishko that the torn boot was another example of the type of harassment she was suffering. During a tempestuous discussion, Davis left Pishko's office and refused his requests that she return. Pishko then went to Sykes, and, after informing him of the events that had transpired, asked Sykes to discharge Davis. Davis was thereupon called to Sykes' office and discharged. She alleges, and Sykes denies, that Sykes told her, among other things, that her discharge was for "her safety's sake."

Davis complained to the City of Pittsburgh Commission on Human Relations (PCHR) on February 4, 1970, the day after her discharge. She claimed that an atmosphere of racial intolerance was maintained at U.S. Steel; that she had been subjected to harassment by fellow employees during the last three years of her employment; that her complaints to supervisors had largely been ignored; that she had been improperly discharged; and that her discharge occurred after Taylor, who had been sensitive to her complaints, was transferred to another city.

The Commission conducted a full adversarial hearing regarding Davis' complaint on June 4, 1971. Nine witnesses—Davis among them—testified and were subjected to cross-examination. The PCHR issued its decision on March 6, 1972 and found that U.S. Steel had violated Section 8(a) of the Pittsburgh Human Relations Ordinance because it had treated Davis differently from the way it treated other employees.[1] The PCHR accordingly ordered U.S. Steel to cease and desist from racial discrimination, to reinstate Davis, and to award her back pay. A supplemental order of October 2, 1972 specified the amount of damages.

U.S. Steel appealed that decision under 53 Pa.Stat.Ann. §§ 11307, 11308 (Purdon 1972)[2] to the Allegheny County Court of

1. Section 8(a) of the City of Pittsburgh Ordinance No. 75 of 1967, as amended, provided: It shall be an unlawful employment practice, except where based upon applicable national security regulations established by the United States, by the Commonwealth of Pennsylvania, or by any political subdivision of the Commonwealth having jurisdiction in the City of Pittsburgh, or except where based upon a bona fide occupational exemption certified by the Commission in accordance with Section 7, subsection (d) of this ordinance: (a) For any employer to refuse to hire any person or otherwise to discriminate against any person with respect to hiring, tenure, compensation, promotion, discharge or any other terms, conditions or privileges directly or indirectly related to employment because of race, color, religion, ancestry, national origin or place of birth.

2. Section 11308(b) provided:

(b) In the event a full and complete record of the proceedings before the local agency was made, the court to which the appeal is taken shall hear the appeal without a jury on the record certified by the local agency. After hearing, the court shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with the law, or that the provisions of this act have been violated in the proceeding before the agency, or that any finding of fact made by the local agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may set it aside or modify it, in whole, or in part, or may remand the proceeding to the local agency for further disposition in accordance with the order of the court.

Common Pleas, which concluded that the PCHR's decision was supported by substantial evidence and was neither arbitrary not capricious. The Common Pleas Court therefore dismissed the appeal. U.S. Steel appealed that determination to the Commonwealth Court of Pennsylvania. In a unanimous opinion the Commonwealth Court reversed the Court of Common Pleas and held, after carefully reviewing the record, that there was inadequate support for the conclusion that the Pittsburgh ordinance had been violated. The court focused on the issue of discriminatory discharge, but clearly indicated in its opinion that it understood that there were also broader charges of racial discrimination in the case. The court stated that "[t]he crucial issue involved in this case is whether or not Davis was treated differently by the Supply Division because of her race." The court concluded that "[t]he findings offer no information concerning how the Supply Division discriminated 'in dismissing Mrs. Davis' and therefore do not support the Commission's conclusion." It also determined that the Commission's finding that Davis' supervisor gave little credence to Davis' complaints was not supported by the evidence. The court also considered a charge that Davis was discriminated against because of the manner in which her file was kept; but it found no evidence that her file was treated differently before her discharge, and considered the post-discharge differences normal for an employer facing a lawsuit. The Commonwealth Court held that there were no findings supported by substantial evidence that U.S. Steel had treated Davis differently because of her race, and accordingly entered a judgment vacating the orders of the PCHR. *United States Steel Supply Division of United States Steel Corp. v. City of Pittsburgh*, 16 Pa.Commw. 425, 332 A.2d 871 (1975).

A substantially similar provision is now codified in 2 Pa.Cons.Stat.Ann. § 754(b) (Purdon Supp. 1982).

3. Since most of the alleged racial harassment would have occurred more than six years before Davis filed her section 1981 complaint,

Davis did not appeal that decision to any higher Pennsylvania court; nor, of course, did U.S. Steel. Instead, Davis filed suit in the United States District Court for the Western District of Pennsylvania on August 13, 1975, alleging that her discharge by U.S. Steel constituted a violation of 42 U.S.C. § 1981. In her federal complaint, Davis alleged that she was subjected to a pattern of discrimination consisting of racial slurs and racially motivated harassment, and that she was unlawfully dismissed from her employment. She sought damages to compensate her for lost wages, fringe benefits, and pension rights, as well as costs and attorneys fees. Initially, the district court held that her claim was time-barred, 405 F.Supp. 394 (W.D.Pa.1976). A panel of this Court reversed that determination and held that the complaint was timely. It held that, "where the gist of a § 1981 complaint concerns racially discriminatory discharge of an employee under the facts in this record," then the applicable Pennsylvania statute of limitation is 12 P.S. § 31, which provides a six year period.[3] *Davis v. United States Steel Supply, Division of United States Steel Corporation*, 581 F.2d 335, 341 n.8 (3d Cir. 1978). In its opinion the panel noted that "[t]he *res judicata* force of state judicial review of local administrative adjudications depends on a variety of factors which have not been developed in the record in this case"; the Court therefore specifically refrained from expressing any view at that time as to the res judicata effect to be accorded to the Commonwealth Court's decision in Davis' subsequent section 1981 action. 581 F.2d at 340 n.5. The panel, however, did not have the advantage of the clarification of the law that the Supreme Court recently supplied in *Kremer v. Chemical Construction Corp.*, —— U.S. ——, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

there is a question whether the statute of limitation bars any portion of her claims regarding racial harassment. In view of our disposition of this case on res judicata grounds, however, we need not decide this issue.

On remand, the district court denied U.S. Steel's motion for summary judgment on res judicata grounds and held that the Pennsylvania Commonwealth Court judgment was not a bar to the federal claim. In its order of February 13, 1979, the district court stated, without lengthy explanation, that *"res judicata* does not foreclose the instant action where [after an initial administrative decision the] defendant has pursued state appellate remedies rather than the plaintiff." Appendix at 305. It cited in support of that proposition the Second Circuit line of cases following *Mitchell v. National Broadcasting Co.,* 553 F.2d 265, 275 (2d Cir. 1977). The district court's decision, like that of the initial panel, antedated the Supreme Court's *Kremer* decision.

After the denial of the summary judgment motion, the matter was tried on the merits before the district judge sitting without a jury. By stipulation of both parties and with the consent of the court, the evidence in the federal court proceeding was limited to the PCHR record and a deposition of Davis.[4] On the basis of that evidence, the district court concluded in a Memorandum Opinion and Order of October 19, 1979 that U.S. Steel had discharged Davis in violation of 42 U.S.C. § 1981. The court rested this conclusion on a finding that U.S. Steel "practiced racial discrimination in discharging Davis," explaining that the record did not support any of the other motivations for dismissal that were alleged by U.S. Steel. The district court appears to have based its decision solely on the finding of discriminatory discharge, not on the broader discrimination charges. In a subsequent opinion based on the same submissions and three additional exhibits, the court determined the amount of Davis' damages ($44,236.11, and $6,500 in attorney's fees and costs) and the issue of mitigation.

On appeal from that decision, U.S. Steel argues that the district court erred in denying the motion to dismiss on res judicata grounds, that the court's findings of a racially discriminatory motive for the dismissal were clearly erroneous, and that the court erred in awarding damages to Davis. Following a decision by a panel of this Court, we granted a petition to consider the case in banc and vacated the opinion of the panel.

We now hold, in light of the Supreme Court's recent decision in *Kremer,* that Davis' federal claim under section 1981 is barred by res judicata. Because we so hold, we do not reach the remaining issues raised by U.S. Steel.

## II

■■ Under federal law, "[t]he ... judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...." 28 U.S.C. § 1738.[5] Thus, section 1738 requires federal courts to give res judicata effect to a state judgment to the extent the state would give its own prior judgment such effect. Res judicata, however, is an affirmative defense, *see* Fed. R.Civ.P. 8(c), and the party asserting such a bar bears the burden of showing that it applies. According to a recent decision of Pennsylvania's highest court (the "best authority" on the State's law, see *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967)), for res judicata to apply there must be a showing that "between the previous action and the present action there [is] an identity in the thing sued on, identity of the cause of action, identity of the persons and parties to the action, and identity of the quality or capacity of the parties suing or sued." *Duquesne Slag Products Co. v. Lench,* 490 Pa.

---

4. During the course of the proceedings the stipulation was amended to permit the consideration of two additional letters, both relating to Davis' efforts to seek employment subsequent to her discharge.

5. This provision has existed in virtually unchanged form since 1790. *Allen v. McCurry,* 449 U.S. 90, 96 n.8, 101 S.Ct. 411, 416 n.8, 66 L.Ed.2d 308 (1980).

102, 105, 415 A.2d 53, 55 (1980). See also *Callery v. Municipal Authority*, 432 Pa. 307, 312, 243 A.2d 385, 387 (1968) ("The essential inquiry is whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties had an opportunity to appear and assert their rights.")

■ There does not appear to be any relevant failure of proof on the part of U.S. Steel as to at least three of these factors. Thus, there can be little question as to the identity of the parties, the identity of quality and capacity of the parties, or the identity of the thing sued on. Davis and U.S. Steel were the opposing parties in both actions, and both lawsuits challenge the same conduct of U.S. Steel. Nor, given the identity of the parties, is there any reason to suppose that under Pennsylvania law U.S. Steel's ability to assert the res judicata defense would be undermined by the fact that U.S. Steel was the party that instituted the judicial action resulting in the state court judgment. This conclusion is in accord with Pennsylvania's principle of mutuality of estoppel under which "one may not have the benefit of a judgment as an estoppel unless he would have been bound by it had it been the other way. . . ." *See Helmig v. Rockwell Mfg. Co.*, 389 Pa. 21, 32, 131 A.2d 622, 627–28 (citing cases), *cert. denied*, 355 U.S. 832, 78 S.Ct. 46, 2 L.Ed.2d 44 (1957). Consequently, if U.S. Steel would not have been bound by an unfavorable state court judgment, it would not now be entitled to assert res judicata. But because U.S. Steel would have been bound by a judgment against it, mutuality of estoppel is not violated by allowing U.S. Steel to raise the res judicata defense now. The principle of mutuality of estoppel is subject to exceptions, but none is applicable here. See *Helmig, supra*, and *Posternack v. American Casualty Co. of Reading*, 421 Pa. 21, 25, 218 A.2d 350, 352 (1966).

■ More difficult is the question of identity of the causes of action. A single cause of action may comprise claims under a number of different statutory and common law grounds. *Kremer, supra*, —— U.S.

at —— —— n.22, 102 S.Ct. at 1897 n.22; *Antonioli v. Lehigh Coal and Navigation Co.*, 451 F.2d 1171, 1176–78 (3d Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972); *Williamson v. Columbia Gas & Electric Corp.*, 186 F.2d 464, 468 (3d Cir. 1950). Rather than resting on the specific legal theory invoked, res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims, although a clear definition of that requisite similarity has proven elusive. *See Donegal Steel Foundry Co. v. Accurate Products Co.*, 516 F.2d 583, 588 n.10 (3d Cir. 1975) (considering various proposed definitions); C. Wright, A. Miller & E. Cooper, 18 *Federal Practice and Procedure* § 4407 (1981 & Supp.1982).

Whatever the conceptual difficulties inherent in any definition of a "cause of action," often the presence of a single cause of action is clear. For example, in the two actions involved in this case, as in *Williamson:*

> the acts complained of and the demand for recovery are the same. The only thing that is different is the theory of recovery. The same witnesses and documents will be necessary in the trial in both cases. No material fact is alleged in [the second action] that was not alleged in [the first]. . . . Everything plaintiff was entitled to ask for from defendant was included in [the first action].

186 F.2d at 470. In both her state and federal proceedings, Davis sought redress for her treatment at the hands of U.S. Steel on the ground that the treatment was racially discriminatory and therefore illegal. Indeed, the closeness of her claims in both the state and federal proceedings is revealed by her decision to rest her federal claim almost entirely upon the record of the state proceeding. *Cf. Herendeen v. Champion International Corp.*, 525 F.2d 130, 133–35 (2d Cir. 1975) (one test for identical causes of action is "whether the same evidence is necessary to maintain the second cause of action as was required in the first").

Section 1981's prohibition against racial discrimination in private employment and the Pittsburgh ordinance forbidding any employer from discriminating against any employee in any way "directly or indirectly related to employment" because of that employee's "race, color, religion, ancestry, national origin or place of birth" both clearly outlaw the discrimination complained about by Davis. The procedural setting of this case in this sense is quite similar to that in *Kremer*. Kremer, who alleged that he had been subjected to discriminatory employment practices, sought relief in federal court under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.*, after New York courts upheld an administrative decision by the New York Human Rights Division summarily dismissing his claim. The United States Supreme Court, rejecting a contention that res judicata did not apply because the causes of action under Title VII and the New York law were different, observed that "the alleged discriminatory acts are prohibited by both federal and state laws," and that "[t]he elements of a successful employment discrimination claim are virtually identical [under the two statutes]." —— U.S. at ——, 102 S.Ct. at 1896. Given the obvious overlapping of the two statutes here, U.S. Steel has, as had the employer in *Kremer*, satisfied its burden of proving an identity of causes of action. As the Pennsylvania Supreme Court noted in *Commonwealth v. Ligon*, 454 Pa. 455, 460, 314 A.2d

227, 230 (1973), "[a] litigated claim is not given new life because of the invention of another theory to support that claim." Although *Ligon* was a criminal appeal, we believe that Pennsylvania would take a similar approach in a case such as the present civil action.

■ Arguably, a court judgment reviewing an administrative proceeding might in some circumstances be denied res judicata effect if there were procedural deficiencies in the administrative proceeding, and the court's standard of review were limited, or if the administrative decision were not deemed to be final. *E.g., International Union of Operating Engineers, Local No. 714 v. Sullivan Transfer, Inc.*, 650 F.2d 669, 672–76 (5th Cir. 1981); *Mitchell v. National Broadcasting Co., supra*, 553 F.2d at 267–68. Before the PCHR, Davis received the equivalent of a full judicial hearing.[6] Indeed, as previously noted, she was willing to rely on the record of that proceeding for her federal claim, and there is no indication that she considered the hearing to have been procedurally inadequate. Moreover, the administrative judgment in Davis' case was fully reviewed by the Pennsylvania courts. Given her decision not to file an appeal to the Pennsylvania Supreme Court, the Commonwealth Court's decision is now final within the state system.[7]

■ Davis argues that the appellate review of the PCHR decision by the state courts should not be treated as a judgment

6. The procedures provided under the PCHR proceeding were far more extensive than those upheld as adequate in *Kremer*. In *Kremer* the New York agency had concluded, after extremely informal proceedings, that Kremer's claim was without merit and should be dismissed. The United States Supreme Court acknowledged that 28 U.S.C. § 1738 would apply only if there had been "a full and fair opportunity" to litigate the claim before the state tribunal. The Court concluded, however, that for purposes of section 1738 a "full and fair opportunity" had been provided whenever "state proceedings . . . satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." —— U.S. at —— ————, 102 S.Ct. at 1897. The Court then held that the procedures by which Kremer's claim was decided satisfied due process requirements. It is unnecessary to decide in this case

whether, under Pennsylvania law, the PCHR could be considered a court of record. We also note that section 1981, unlike Title VII (*see* 42 U.S.C. § 2000e–5(c)), does not appear to require aggrieved employees to first pursue adequate state administrative remedies. See note 12, *infra*. It was Davis' decision to bring her claim before the PCHR rather than initially filing a section 1981 complaint in federal court.

7. We are not aware of any case which resolves the precise issue of the *res judicata* effect under Pennsylvania law of a court decision reviewing a local agency decision that has been approved by a court of statewide jurisdiction. But this does not relieve us of our responsibility to predict how the Pennsylvania courts would rule.

on the merits of her federal complaint because the standard of review adhered to by the Commonwealth Court did not constitute an adjudication of whether, in fact, U.S. Steel discriminated against her on the basis of race. Davis contends that the Commonwealth Court's holding—that "none of the [Commission's] findings is sufficient to support the Commission's conclusion" that U.S. Steel discriminated against her in violation of the Pittsburgh ordinance, 332 A.2d at 876—is different from a conclusion that U.S. Steel did not discriminate against Davis for racial reasons. Her argument, however, requires a crabbed and unduly technical reading of the Commonwealth Court's opinion. Whatever language the court utilized, the court clearly concluded that the findings and record in the case were inadequate to support the conclusion that U.S. Steel had discriminated against Davis because of her race. In *Kremer* the Supreme

Court considered and rejected an argument comparable to that advanced by Davis. Kremer contended that the New York Supreme Court decision upholding the NYHRD's dismissal of his claim should not be deemed an adjudication on the substance of his claim because the standard of review for the New York court was whether or not the NYHRD had acted arbitrarily or capriciously. The Supreme Court held that the New York court's affirmance of the dismissal was an implicit determination that the complaint lacked merit as a matter of law. —— U.S. at —— n.21, 102 S.Ct. at 1896 n.21.[8] Similarly, we conclude here that the state proceedings and in particular the Commonwealth Court's rejection, on the merits, of the PCHR's conclusion that U.S. Steel discriminated against Davis, constitutes a full and fair adjudication of Davis' race discrimination claim.[9]

8. The two dissenting opinions in *Kremer* rejected the majority's reasoning and contended that the New York court decided no more than whether the agency acted arbitrarily or capriciously. —— U.S. at ——, 102 S.Ct. at 1903 (Blackmun, J., dissenting); *id.* at —— & n.*, 102 S.Ct. at 1911 & n.* (Stevens, J., dissenting). Even under the arguments set out by the dissent in *Kremer*, however, the Pennsylvania court's holding here is a decision on the merits. The Pennsylvania court was obliged not merely to determine whether the PCHR had abused its discretion, but also to consider whether the PCHR's conclusion in favor of Davis was supported by the record and by the PCHR's factual findings based on that record. Such a review terminating in a rejection of the PCHR's findings and conclusion would not appear to be distinguishable from a full judicial consideration of the merits of Davis' case.

9. Even if one somehow could distinguish the actions under the Pittsburgh ordinance and under § 1981 so that res judicata would not apply, the Commonwealth Court's conclusion that U.S. Steel had not been shown to have acted with a racially discriminatory motive still would constitute collateral estoppel against a similar allegation in a § 1981 action. As long as the Pennsylvania procedures were fair and adequate under 28 U.S.C. § 1738, Davis would "at least [be] estopped from relitigating the issue of employment discrimination arising from the same events." *Kremer*, —— U.S. at —————— n.22, 102 S.Ct. at 1897 n.22. *See Brown v. DeLayo*, 498 F.2d 1173, 1175 (10th Cir. 1974). Although in this opinion we discuss Davis' claim in terms of res judicata, our analy-

sis would not be significantly different if collateral estoppel rather than res judicata were invoked. The rule in Pennsylvania stated in *Safeguard Mutual Insurance Co. v. Williams*, 463 Pa. 567, 574, 345 A.2d 664, 668 (1975), is that "a plea of collateral estoppel is valid if 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action."

This applies even if the causes of action are not identical. See *Schubach v. Silver*, 461 Pa. 366, 377, 336 A.2d 328, 333–334 (1975), adopting the rule of Restatement, Judgments § 68 ("Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action...."

We doubt that the issue of collateral estoppel was abandoned by U.S. Steel. In stipulating before trial that the issue of *"res judicata"* remained to be litigated, the parties may have been using this term inclusively to refer both to "claim preclusion" (*res judicata* in the narrow sense) and to "issue preclusion" (collateral estoppel). *See* C. Wright, A. Miller and E. Cooper, 18 *Federal Practice and Procedure* § 4402 (1981), which states that "substantial progress has been made toward" this broad usage.

■ It appears, therefore, that Pennsylvania would consider the state court review of the PCHR's decision res judicata against a subsequent race discrimination claim filed in the Pennsylvania courts. By the mandate of 28 U.S.C. § 1738, therefore, the federal courts are obliged to accord to the Pennsylvania judgment the same preclusive effect against Davis' claim filed in federal court, unless some other federal constitutional or statutory policy interdicts application of the statute to her lawsuit. We turn, then, to a consideration of the relevant federal antidiscrimination policies.

### III

Whether in federal or state courts, "res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). *See also Southern Pacific Railroad Co. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897); *Switlik v. Hardwicke Co., Inc.*, 651 F.2d 852 (3d Cir.), *cert. denied*, 454 U.S. 1064, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981). Moreover, when applied by a federal court to give preclusive effect to a state court judgment, "res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Allen v. McCurry*, 449 U.S. at 95–96, 101 S.Ct. at 415 (citing *Younger v. Harris*, 401 U.S. 37, 43–45, 91 S.Ct. 746, 750–751, 27 L.Ed.2d 669 (1971)). *See also New Jersey Education Association v. Burke*, 579 F.2d 764, 771–72 (3d Cir.), *cert. denied*, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978). The policies behind *res judicata* and section 1738 go beyond encouraging parties to plead all grounds for relief in a single lawsuit; the

rationales cited above seem to be applicable even where a party seeks to relitigate an adjudicated claim on the basis of a legal theory which, for one reason or another, he was unable to invoke in the previous proceeding.

Mindful of these concerns, the Supreme Court has applied section 1738 broadly. Drawing on its decision in *Allen v. McCurry*, the Court reiterated in *Kremer, supra*, that "an exception to § 1738 will not be recognized unless a later statute contains an express or implied partial repeal." —— U.S. at ——, 102 S.Ct. at 1889. In order to conclude that 42 U.S.C. § 1981 constitutes an exception to the section 1738 rule of full faith and credit, therefore, we must uncover some indication in the language or legislative history of section 1981, or perhaps in some related legislation, that Congress intended to create such an exception.

■ Looking first to the language of section 1981, we can discern no sign that Congress intended that a procedurally adequate state court judgment resolving a claim of racial discrimination in employment should not be given full faith and credit in a similar action brought in federal court under section 1981. Indeed, the statute itself provides no guidance whatsoever as to the relationship between state and federal proceedings. It reads, in its entirety:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Because it neither stipulates the manner in which employment discrimination suits should be pursued,[10] nor connotes any sug-

---

**10.** The Supreme Court analyzed and explained the application of § 1981 to actions by private parties in *Runyon v. McCrary*, 427 U.S. 160, 168–79, 96 S.Ct. 2586, 2593–2598, 49 L.Ed.2d

415 (1976). See also *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975) (establishing that "§ 1981 affords a federal remedy

gestion that a party may litigate section 1981 claims even after a full and fair litigation of an identical claim in state court, the statutory language does not provide the clear expression of an intent to modify section 1738 that is referred to by *Kremer* and *McCurry.*

We turn, therefore, to the legislative history of section 1981 to determine whether that statute contains an implicit exception to the "full faith and credit" requirement of section 1738. Section 1981 derives from the Civil Rights Act of 1866 and the reenactment of section 1 of that Act in sections 16 and 18 of the Civil Rights Act of 1870. *Runyon v. McCrary,* 427 U.S. 160, 168–70 n.8, 96 S.Ct. 2586, 2593–2594 n.8, 49 L.Ed.2d 415 (1976); *Mahone v. Waddle,* 564 F.2d 1018, 1030 (3d Cir. 1977). As we observed in *Mahone,* the legislative history of these acts manifests "Congress' purpose to enact sweeping legislation implementing the thirteenth amendment to abolish all the remaining badges and vestiges of the slavery system." 564 F.2d at 1030. The legislative history also reflects a fear that some state courts might remain hostile forums for adjudication of rights under the thirteenth, and later the fourteenth, amendments. The original 1866 legislation provided that federal court jurisdiction would be exclusive for "persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act." Act of April 9, 1866, ch. 31, § 3, 14 Stat. 27 (1866). In addition, the Act provided that a defendant in any state court proceeding initiated to punish acts committed in furtherance of the Civil

Rights Act would have the right to have the case removed to federal court. *Id.*

Nowhere in the legislation, in its legislative history, or, indeed, in any of the Act's subsequent refinements,[11] did Congress suggest that by conferring jurisdiction on federal courts it meant to render ineffective state court judgments having to do with race discrimination. Quite to the contrary, the 1866 legislation carefully limited federal jurisdiction to those instances in which the states had failed to provide effective enforcement of individual rights. The 1866 legislation in this respect appears quite similar to the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983. The Supreme Court has held that section 1983 bespeaks no legislative intent to modify the full faith and credit requirement of section 1738. In *Allen v. McCurry, supra,* the Court reviewed the legislative history leading up to the passage of section 1983 and concluded that the legislators, although concerned about inadequate state enforcement of constitutional rights, did not intend to lessen the credit given to *valid* state judgments. The Court explained that:

> Congress realized that in enacting § 1983 it was altering the balance of judicial power between the state and federal courts.... But in doing so, Congress was adding to the jurisdiction of the federal courts, not subtracting from that of the state courts.... The debates contain several references to the concurrent jurisdiction of the state courts over federal questions, and numerous suggestions that the state courts would retain their established jurisdiction so that they could,

---

against discrimination in private employment on the basis of race"); *General Building Contractors Association, Inc. v. Pennsylvania,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (holding that relief under § 1981 requires a showing of discriminatory intent). *See generally* Comment, *Developments in the Law—Section 1981,* 15 Harv.C.R.-C.L.L.Rev. 29 (1980).

11. This Court has construed as the modern counterpart of the procedural provisions contained in § 3 of the 1866 Act the language of 28 U.S.C. § 1343(3), which provides that:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> \*  \*  \*  \*  \*  \*
>
> To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

*See Mahone v. Waddle,* 564 F.2d 1018, 1032–36 (3d Cir. 1977).

when the current political passions abated, demonstrate a new sensitivity to federal rights.

449 U.S. at 99–100, 101 S.Ct. at 417–418 (footnotes omitted). In support of this interpretation the Court made specific reference to the 1866 Act, observing that: .

> To the extent that Congress in the post-Civil War period did intend to deny full faith and credit to state-court decisions on constitutional issues, it expressly chose *the very different means of postjudgment removal* for state-court defendants whose civil rights were threatened by *biased* state courts and who therefore "are denied or cannot enforce [their civil rights] in the courts or judicial tribunals of the State."

*Id.* at 99 n.14, 101 S.Ct. at 417 n.14 (quoting Act of Apr. 9, 1866, ch. 31, § 3, 14 Stat. 27) (emphasis added). The Court thus construed the 1866 Act as affecting the weight properly given to state judgments only if those judgments arose out of state proceedings that were defective.

Although *Allen v. McCurry* recognized that procedural or constitutional defects in a state court judgment would undercut full faith and credit in the section 1983 context, the Court declared that such an exception to the dictates of section 1738 "would be essentially the same as the important general limit on rules of preclusion that already exists: Collateral estoppel does not apply *where the party against whom an earlier* court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Id.* at 101, 101 S.Ct. at 418. The Court distinguished its reading of the statute from the more expansive interpretation that it rejected: that "Congress intended to allow relitigation of federal issues decided after a full and fair hearing in a state court simply because the state court's decision may have been erroneous." *Id.* (footnote omitted).

As this Court previously has observed, section 1981 need not be construed identically with section 1983: the two statutory provisions are aimed at different wrongs and are derived from different constitutional sources. *Croker v. Boeing Co.*, 662 F.2d 975, 987 (3d Cir. 1981) (in banc); *Mahone v. Waddle, supra,* 564 F.2d at 1030. With respect to their relation to section 1738, however, there appears to be little reason to infer that divergent results were intended by the drafters of the two roughly contemporaneous statutes. Both Acts reflects a desire to alter federal-state relations to ensure fair adjudication of constitutional claims; neither suggests that state judgments fairly rendered should be reviewed *de novo* by a federal tribunal. In view of the analysis adopted by the Supreme Court in *Allen v. McCurry,* and in the absence of any demonstrated reason to infer that section 1981 was intended to affect state judgments other than those shown to be unfair, biased, or arrived at in a procedurally deficient fashion, we conclude that section 1981 does not modify, implicitly or explicitly, the requirement of section 1738 that state court . judgments be given full faith and credit by federal tribunals.[12]

---

12. The district court, in relying on the line of Second Circuit cases headed by *Mitchell, supra,* indirectly suggested that Title VII implicitly modified section 1738 as this section applies to actions filed under section 1981. Title VII's deferral scheme requires employees to pursue adequate state administrative remedies prior to bringing a Title VII claim before the EEOC and the federal courts. 42 U.S.C. § 2000e–5(c). The Supreme Court in *Kremer* emphasized that the deferral scheme does not require appeals to state courts. The Court held that a state court affirmance of an unfavorable state agency decision on a discrimination claim did constitute res judicata against a similar claim brought under Title VII. —— U.S. at —— ——, 102 S.Ct. at 1889–1895. *See also Sinicropi v. Nas-* *sau County,* 601 F.2d 60 (2d Cir. 1979). If this is so, it can hardly be argued that Title VII modifies the rules of res judicata so that the same state court judgment would *not* be owed full faith and credit in a *section 1981* action. Even if one construes Title VII as, by implication, altering section 1981 in order to harmonize both civil rights statutes, there is no basis for inferring that the drafters of Title VII somehow meant to extend the availability of section 1981 relief even to situations where Title VII itself was not available. *Kremer,* however, does not resolve the issue of whether in a Title VII case the same result would be reached when the employer pursued state court appellate relief after an agency decision in favor of the employee. But whatever the correct rule in

## IV

It may be, as Justice Blackmun contended in his dissent in *Kremer*, that procedural rules such as res judicata and collateral estoppel can "serve as a trap for the unwary *pro se* or poorly represented complainant." —— U.S. at ——, 102 S.Ct. at 1910. Such a concern may justify legislative attention to the interplay between Title VII and section 1981 and a clear congressional statement as to the way in which the two statutes should operate together to combat racial discrimination in employment. In view of the Supreme Court's decisions in *Kremer* and *McCurry*, however, we believe that under existing law Davis' section 1981 claim is barred by res judicata. Accordingly, the judgment of the district court will be reversed.

GARTH, Circuit Judge, concurring.

I concur fully with Judge Adams's analysis in the majority opinion and the result which it reaches. Thus I am privileged to join that opinion. I write separately, however, to emphasize some particular aspects of this case which clearly bring it within the ambit and reasoning of *Kremer v. Chemical Construction Corp.*, —— U.S. ——, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

I preface these remarks by noting that as a member of the panel which initially considered Davis's appeal, I had been of the view that Congress had always intended to provide victims of employment discrimination with a federal fact-finding forum and that Congress's clear expression of this intent was sufficient to override and supersede any requirement of Section 1738. It

was my belief that the importance of a federal fact-finding forum in the employment discrimination context set off this category of cases from cases that might otherwise respond to the concerns of comity and judicial efficiency, both of which are ordinarily served by applying a res judicata bar.[1]

The dissenting opinion of now Chief Judge Feinberg in *Mitchell v. National Broadcasting Corp.*, 553 F.2d 265, 277–80 (2d Cir. 1977) (Feinberg, J., dissenting), substantiated my view that federal fact-finding in this context was clearly intended. The majority opinion in *Mitchell* had held that Mitchell, who had filed a complaint charging that she had been dismissed from her position as a result of discriminatory employment practices was barred by res judicata from bringing a Section 1981 claim in federal court. Her federal action had been brought after her claim had been rejected by the New York State Division of Human Rights, and after her appeals had been rejected by the New York State Human Rights Appeals Board and the Appellate Division of the New York State Supreme Court. Judge Feinberg had dissented from the majority's conclusion that Mitchell was not entitled to still another trial on her employment claim.

I had also been influenced by this court's decision in *Smouse v. General Electric Co.*, 626 F.2d 333 (3d Cir. 1980), a Title VII action brought against General Electric claiming discrimination against women who had been transferred from full to part-time positions as a result of a phase out of opera-

the Title VII context, nothing in Title VII manifests a concern with section 1981 sufficiently broad to justify an inference that Title VII modified the operation of section 1738 in section 1981 actions in situations where an employee brings a section 1981 complaint in federal court after losing an appeal in state court that was taken by the employer. Rather, the intent appears to be that recognized in *Johnson v. Railway Express Agency, supra*, 421 U.S. at 466, 95 S.Ct. at 1723, and in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974): that section 1981 should remain available as an *independent* remedy, virtually unaffected by the enactment of

Title VII. Evidence of a legislative intent to modify section 1981 even as it applies to the relatively unusual procedural setting before us, in a context in which Title VII is not directly involved, would appear to be far too attenuated to satisfy the relatively demanding requirements of *McCurry* and *Kremer*.

1. For a discussion of the res judicata effect of state court judgments in state court, *see Lehman v. Lycoming County Childrens Services*, 648 F.2d 135, 138–39 (3d Cir. *en banc*) *aff'd*, —— U.S. ——, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).

tions at General Electric's plant in West Mifflin. In *Smouse*, this court held that state administrative proceedings conducted by the Pennsylvania Human Relations Commission, even though reviewed through and by the highest court of Pennsylvania, could not bar federal relitigation of Title VII discrimination claims for purposes of res judicata. Then, as now, I perceived no reason to distinguish an action commenced under Section 1981 (Davis's and Mitchell's) from an action commenced under Title VII (Smouse's), and I would have held that the predominant federal policy involved in both those types of actions did not permit res judicata to operate as a bar to the maintenance of a federal suit.

Of course, all of those views are now "water under the bridge." Since espousing those thoughts, not only has the panel opinion which contained them been vacated, *Davis v. United States Steel Supply, Division of United States Steel Corporation*, No. 80–2571 (Nov. 6, 1981), but the United States Supreme Court has now decided the very issue with which we are faced, namely, whether a federal discrimination action should be barred by prior state proceedings concerning the same allegation of discrimination, *Kremer v. Chemical Construction Corp., supra.*

It is clear to me, as Judge Adams's opinion for the majority of the court holds, that *Kremer* definitively resolves the issue that res judicata bars the present 1981 action brought by Ms. Davis. The fact that Kremer brought a Title VII action and Davis a § 1981 action, as I have indicated, is a distinction without a difference. Moreover, as I read *Kremer*, I find that other suggested distinctions are insubstantial.

Justice White, writing for the *Kremer* Court, must have been aware of Justice Blackmun's dissenting observation, the thrust of which was that res judicata should not apply where the *plaintiff* had not sought judicial review of the administrative action but had rather been forced into a state forum by the defendant. *Kremer v. Chemical Construction Corp.,* —— U.S. at ——————— n.18, 102 S.Ct. at 1907–1909 n.18 (Blackmun, J., dissenting); *see also*

*Mitchell v. National Broadcasting Corp.,* 553 F.2d at 275 n.13. Having been faced with the argument that in such a situation the plaintiff who had been discriminated against might well be barred from prosecuting a later federal action, the majority opinion did not even address that hypothesis. In my opinion, by failing to do so, the Supreme Court has clearly indicated that no such distinction can avoid the res judicata bar. Thus, at least to me, it is now evident that § 1738 bars a federal proceeding which seeks to litigate the same discriminatory actions adjudicated in a prior state court proceeding, even though it was not the plaintiff who chose the state court forum.

Moreover, I observe that in this case Ms. Davis, who could have initially instituted her 1981 action in federal court, did not do so. Ms. Davis was not obliged as was Kremer, to defer to a local administrative agency in the first instance. Kremer, it should be remembered, was a Title VII claimant and was therefore required by statute initially to seek relief under state or local law. *See,* 42 U.S.C. § 2000e–5(c). Ms. Davis, who was under no such obligation, nevertheless opted to proceed before the Pittsburgh Commission on Human Relations, rather than to file her § 1981 action directly in federal court as she could have. Accordingly, she cannot be heard to complain, when, after having her charges adjudicated by the Pennsylvania state courts, she is now precluded from relitigating those very same claims in federal court.

I note also, as Judge Adams has aptly observed, (Maj. op. page 172), that at no time did Ms. Davis ever challenge the procedures of the Pittsburgh Commission on Human Relations. Ms. Davis never charged that she was denied discovery or that the agency procedures or proceedings were less than adequate (if indeed they were), or that a complete record had not been made (which indeed it had), or that there was any other imperfection with the record developed before the Commission. To the contrary, Ms. Davis stipulated with the defendant that the very same record created before the Commission, with minor exceptions not relevant here, should be the record on which her claims should be re-

solved, not only in the state courts but in federal court as well. Ms. Davis so stipulated, despite the fact that had the record been insufficient, the Pennsylvania Court of Common Pleas could have heard her complaint *de novo.* *See* Pa.Stat.Ann. tit. 53, § 11308(a) (current version at 2 Pa.Cons. Stat.Ann. § 754(a) (1964–1981 Supp.)). Thus, whatever distinction one may seek to assert where an administrative record is developed inadequately or improperly, such distinction is inapposite here.

Hence, for at least two reasons—(1) Davis's affirmative selection of the Pittsburgh Commission on Human Relations as the forum to hear her claims in lieu of proceeding directly in federal court as she had a right to do; and (2) the fact that a complete, adequate and full record was developed before the Commission and Ms. Davis has never challenged its adequacy before *any* court—it is evident to me that after *Kremer,* Davis's § 1981 claim is a *fortiorari* barred by res judicata.

Because no other issue raised in this case is appropriate for consideration in light of our res judicata holding, I express no opinion with respect to the "findings" made by the district court concerning liability or damages,[2] even though it was the standard governing our review of those findings which gave rise to this court's *en banc* hearing rather than any dispute with the panel's earlier view that Davis's § 1981 action had not been barred by the earlier state proceedings.

For these reasons, as well as for all the reasons so ably set forth in Judge Adams's majority opinion, I join that opinion.

GIBBONS, Circuit Judge, with whom A. LEON HIGGINBOTHAM, Jr., Circuit Judge joins, dissenting:

This case is before us on an appeal from a final judgment against United States Steel Corporation (USS) in favor of Thelma Davis in her action alleging employment discrimination in violation of 42 U.S.C. § 1981. USS contends that the trial court's findings of fact are clearly erroneous, and that in any event the section 1981 action is barred by *res judicata.* The majority reaches only the *res judicata* contention, holding that the section 1981 action is barred. Because, under Fed.R.Civ.P. 8(c), *res judicata* is an affirmative defense, it is important to look at the record to see how the issue was presented in the district court. Moreover a review of the procedural history of this unfortunate lawsuit will serve as a case study in the ability of determined defendants to use the judicial process to delay and eventually deny accountability for discrimination.

## I.

The complaint was filed in August of 1975. USS did not answer, but moved for summary judgment on the ground that the action was time barred. The district court granted that motion.[1] On appeal this court, over four years ago, reversed. At that time Judge Van Dusen, in an opinion in which Judge Adams joined, summarized Ms. Davis' complaint as follows:

Plaintiff's complaint accuses her employer of racially discriminatory conduct in basically two respects. First, U.S. Steel Supply's supervisory personnel are alleged to have failed to correct, and to have tacitly approved, a pattern of racial abuse directed at Mrs. Davis by her fellow workers. Second, plaintiff alleges that her discharge was in response to her complaints of racial harassment and constituted an unlawful termination of her employment. Plaintiff's complaint cites incidents of abuse and of personal property damage, but not of bodily injury. The

**2.** Because the merits of Ms. Davis's claims (racial discrimination, damages, mitigation of damages) need not be reached and thus have not been addressed, I believe it is also inappropriate to imply, as Judge Sloviter's dissenting opinion seems to, that the district court judgment in Ms. Davis's favor would have withstood appellate review, or that she would have fared differently on the merits in federal court than she did in state court.

**1.** *Davis v. United States Steel Supply, Div. of U.S. Steel Corp.,* 405 F.Supp. 394 (W.D.Pa. 1976).

gravamen of the complaint does not concern Mrs. Davis' interest in personal security, but rather involves unlawful interference with her rights as an employee. Mrs. Davis implicitly asserts a right to good faith efforts by an employer to correct instances of co-worker racial harassment and a right not to be discharged for complaining of such incidents. Essentially, Mrs. Davis complains that U.S. Steel Supply demeaned her and fired her because of her race. In terms of legal relief, plaintiff's complaint does not seek damages for either property or bodily injury. The complaint seeks back wages and fringe benefits lost as a result of her firing.[2]

This is an accurate summary. Ms. Davis complains not merely of the events which occurred on February 2, 1970, but of the atmosphere maintained by USS which culminated in those events.

In the first appeal, although the district court had not reached the issue, USS relied upon res judicata as an alternative ground for affirmance, and Judge Van Dusen's opinion refers to the February 19, 1975 decision of the Commonwealth Court. Addressing that ground, he wrote:

There is an open question under state and federal law whether the Commonwealth Court's reversal of the Commission's order would be accorded res judicata effect in a subsequent private suit brought under either the Human Relations Act or under federal civil rights laws. The res judicata force of state judicial review of local administrative adjudications depends on a variety of factors which have not been developed in the record in this case. See New Jersey Educ. Ass'n v. Burke, 579 F.2d 764 (3d Cir. 1978); Mitchell v. NBC, 553 F.2d 265 (2d Cir. 1977).

The district court, in fact, did not reach the res judicata issue in dismissing plaintiff's § 1981 complaint. We intimate no view as to the proper res judicata effect, if any, that should be accorded the Commonwealth Court's reversal of a finding of discrimination in a subsequent action under the Pennsylvania Human Relations Act of 1981.[3]

Judge Van Dusen's discussion of res judicata was not a casual reference. The issue was argued orally and was the subject of extensive supplemental briefing in the first appeal. Thus even before USS filed an answer, this court, after full argument and briefing, gave the litigants a clear indication that something more than an offhand reference to the Commonwealth Court decision was required before a court could pass on the affirmative defense of res judicata.

## II.

On remand USS did not immediately file an answer. Instead it made a renewed motion for summary judgment. This motion apparently was made orally at a conference with the trial judge, for there is no docket entry for the motion, and no supporting affidavit in the record. Thus there is no way that this court can tell precisely what was presented to the district court in support of the renewed motion for summary judgment. Included in the appendix to the briefs in this court, however, is the affidavit of G.R. Southworth, dated September 5, 1975. (302a–304a). Since that is the date on which the first summary judgment was rendered, it appears that USS relied, in the renewed motion, on the same papers which were before this court in the first appeal.[4] As here relevant, Mr. Southworth's affidavit alleges:

**2.** *Davis v. United States Steel Supply, Div. of U.S. Steel Corp.,* 581 F.2d 335, 338 (3d Cir. 1978).

**3.** 581 F.2d at 340 n.5.

**4.** The certified record in this appeal does not contain the Southworth affidavit or any of the pleadings before either the Pittsburgh Human Relations Commission, the Court of Common Pleas of Allegheny County, or the Common-

wealth Court. It contains only the September 5, 1975 motion, which reads in its entirety:

*MOTION TO DISMISS,*
*OR IN THE ALTERNATIVE,*
*FOR SUMMARY JUDGMENT*

Defendant United States Steel Corporation moves the Court, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss the instant Complaint on the grounds of

2.) Examination of relevant files reveals that Thelma Davis did not file an appeal to the Pennsylvania Supreme Court from the decision by the Commonwealth Court of Pennsylvania on February 19, 1975. (303a). Although the Southworth affidavit does not so allege, the trial court and this court were furnished, in 1975, with a copy of the Commonwealth Court opinion. Since the renewed motion for summary judgment apparently put before the trial court the identical record which was before this court on the first appeal, it is hardly surprising, in light of Judge Van Dusen's opinion noting the inadequacy of that record, that the renewed motion was denied. The trial court, in its order denying that motion, did observe that it was denied "for the reason that *res judicata* does not foreclose the instant action where defendant has pursued state appellate remedies rather than plaintiff." (305a). That ruling, however, did not pass upon the sufficiency, in other respects, of the Southworth affidavit in meeting USS's Rule 8(c) burden. Moreover examination of that sparse affidavit reveals that it presented no question of the collateral estoppel effect to be given any adjudication by a Pennsylvania tribunal, administrative or judicial. The sole issue presented by the September 1975 motion was the *res judicata* effect of the Commonwealth Court decision on the section 1981 action. This court in the first appeal held that the 1975 moving papers were an inadequate record on which to make such a ruling.

### III.

When its renewed motion to dismiss was denied, in March of 1979, USS finally filed an answer, which pleaded affirmatively:

33. Davis' cause of action is barred by the doctrine of *res judicata*.

34. Davis' cause of action is barred by the doctrine of collateral estoppel.

(310a). Thereafter, pursuant to an order entered on the authority of a local rule, the parties filed a pre-trial stipulation. That stipulation set forth a number of admissions. It also placed in evidence the Transcript of Proceedings before the Pittsburgh Human Relations Commission and Ms. Davis' deposition. No other exhibits were made a part of the trial record. Of particular significance is the fact that none of the proceedings in the Pennsylvania state courts were placed in evidence. The stipulation lists as a legal issue the question "[w]hether the instant Complaint is barred by the doctrine of *res judicata*." (381a). It does not list collateral estoppel as an issue. It provides, moreover, that "[t]he foregoing admission of fact having been made, and the parties having specified the issues of fact and law remaining to be litigated, this stipulation shall supplement the pleadings and govern the course of trial unless modified to prevent injustice." *Id.* The stipulation was never modified. Thus it is clear beyond question that the affirmative defense of collateral estoppel pleaded in the answer was abandoned by USS in the pre-trial stipulation. That abandonment is confirmed by the fact that no records of the Pennsylvania courts, upon which a plea of collateral estoppel would have to rest, were included in the trial record. There is simply no basis in the record before us on this appeal for the consideration of a collateral estoppel issue. The majority's suggestion that USS's counsel may not have appreciated the distinction between *res judicata* and collateral estoppel (p. 173 n.9) is, in light of paragraphs 33 and 34 of the answer, preposterous.

As to *res judicata*, the pre-trial stipulation and exhibits do not include even the decision of the Commonwealth Court. The *res judicata* issue is listed as a legal issue, but since no trial record was made on it, USS obviously did not expect the district

lack of jurisdiction over the subject matter and failure to state a claim upon which relief can be granted; or, in the alternative, moves the Court to enter summary judgment in its favor on the basis that the pleadings, together with the affidavit and exhibits attached to the brief accompanying this motion, show that there is no genuine issue as to any material fact and that Defendant United States Steel Corporation is entitled to judgment as a matter of law.

court to pass upon it in the trial on liability. The text of the stipulation makes plain that on that issue USS rested solely upon the affidavit and exhibits which it presented in support of its 1975 motion to dismiss the complaint. Indeed the trial court's liability opinion merely cross references to its summary judgment ruling. (384a). Thus on the *res judicata* issue the case is before us with exactly the same record that was presented to the panel which decided the first appeal. USS then urged that it was entitled to summary judgment as a matter of law because of the Commonwealth Court decision, and this court held that it was not. Today the majority, including a judge who joined in our earlier panel opinion, holds on the same record that it is. In our view the original panel decision was right. The only place in this record in which it presented that issue was in its September 1975 motion for summary judgment, and USS has not established that it is entitled to summary judgment on *res judicata* grounds.

### IV.

In considering whether USS was in 1975 entitled to summary judgment on *res judicata* grounds, this court cannot confine its consideration to the ground recited in the district court's order. That ground, that Ms. Davis did not resort to the state courts but was brought there as a defendant, is in our view correct for reasons set forth hereafter. But entirely aside from that ground, the majority still must be satisfied that USS's summary judgment record entitled it to a judgment as a matter of law. In reaching that conclusion the court must be satisfied: (1) that under Pennsylvania law the courts of that state would treat the judgment relied on as a bar to a subsequent suit on a federal law cause of action; and (2) that even if Pennsylvania courts would ordinarily do so, no overriding federal law prevents that result. The majority's analysis does not satisfy us in either respect.

### A.

We agree with the majority that when presented with a defense of *res judicata*

based upon a final personal judgment in favor of the defendant, our starting point is the direction in 28 U.S.C. § 1738 that "[t]he records and judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State...." The judgment which USS relies upon is that of the Commonwealth Court which "vacated" the orders of the Pittsburgh Commission on Human Relations dated March 6, 1972 and October 2, 1972. It is only that judgment on which USS could rely, for the decisions of the Commission, and of the Court of Common Pleas of Allegheny County which initially reviewed it, were in favor of Ms. Davis, not USS. Restatement (Second) of Judgments § 19 (1982).

The court must, before assessing the effect of that judgment, consider what it actually decided. USS was before the Commonwealth Court as an appellant from a decision of the Court of Common Pleas of Allegheny County. It was before the latter court as an appellant in an appeal brought pursuant to section 7 of the Pennsylvania Local Agency Law, Pa.Stat.Ann. tit. 53, § 11307 (Purdon 1972) (repealed 1978, current version at 2 Pa.Cons.Stat.Ann. § 752 (Purdon Pamph. 1981–82)). That statute reflects the unique status of local municipal agencies under Pennsylvania law. Although those agencies perform adjudications, their proceedings may be, and often are, quite informal. There is no provision for discovery of any kind. The Local Agency Law makes no provision for compulsory process for the attendance of witnesses. Local agencies are not bound by the rules of evidence. Pa.Stat.Ann. tit. 53, § 11305 (now at 2 Pa.Cons.Stat.Ann. § 554). They may, but are not required, to make a complete record of their proceedings. Pa.Stat. Ann. tit. 53, § 11304 (now at 2 Pa.Cons. Stat.Ann. § 553). If a complete record is not made, the Court of Common Pleas may hear the matter de novo. Pa.Stat.Ann. tit. 53, § 11308(a) (now at 2 Pa.Cons.Stat.Ann. § 754(a)). If a complete record is made, the Court of Common Pleas hears the appeal on

the agency record, and

shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of [the Local Agency] act have been violated in the proceedings before the agency, or that any finding of fact made by the local agency and necessary to support its adjudication is not supported by substantial evidence.

Pa.Stat.Ann. tit. 53, § 11308(b) (now at 2 Pa.Cons.Stat.Ann. § 754(b)). The scope of review of the Commonwealth Court is equally narrow. *Civil Service Commission of Philadelphia v. Saladino,* 47 Pa.Cmwlth. 249, 408 A.2d 178 (1979). The scheme of the Local Agency Law reflects the fact that, unlike courts of record and some state agencies, the agencies of Pennsylvania municipalities are often administered by part time personnel and have limited resources. Clearly Pennsylvania law recognizes that local agencies must, considering their limited resources, be permitted to proceed informally, and that such informality is tolerable because those agencies have only limited and specialized jurisdictions. Moreover the limited scope of judicial review of their adjudications reflects the legislative judgment that such a scope of review is appropriate for tribunals having only such limited and specialized jurisdictions. Thus the precise Pennsylvania law issue we must address is what *res judicata* effect that state would give to a decision reviewing, under the Local Agency Law, an adjudication of a local municipal agency.

The majority opinion refers to no Pennsylvania case resolving that question, and our research has not uncovered any. Certainly the two Pennsylvania cases referred to, *Duquesne Slag Products Co. v. Lench,* 490 Pa. 102, 415 A.2d 53 (1980), and *Callery v. Municipal Authority of the Township of Blythe,* 432 Pa. 307, 243 A.2d 385 (1968), are not dispositive, for both involved prior adjudications in courts of record, having unlimited subject matter jurisdiction, in which compulsory witness process and discovery were available, and in which the rules of evidence applied. Even when adjudications have taken place in such tribunals, the

Pennsylvania rule with respect to claim preclusion—*res judicata*—as distinguished from issue preclusion—collateral estoppel—is carefully circumscribed. "For the defense of *res judicata* to prevail, it is necessary that between the previous action and the present action there be identity in the thing sued on, identity of the cause of action, identity of the persons and parties to the action, and identity of the quality or capacity of the parties suing or sued." *Duquesne Slag Products Co. v. Lench,* 490 Pa. at 105, 415 A.2d at 55.

Pennsylvania's carefully articulated rule respecting claim preclusion (we reiterate that a collateral estoppel claim is not presented in this record) is predicated upon the policy in favor of requiring a party to plead in a single lawsuit all legal bases for relief, and to request all forms of relief which might be available as a result of a transaction or series of connected transactions. The rationale for a claim preclusion rule as broad as the underlying transaction is best set forth in the Restatement (Second) of Judgments:

Equating claim with transaction, however, is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined. A modern procedural system does furnish such means. It permits the presentation in the action of all material relevant to the transaction without artificial confinement to any single substantive theory or kind of relief and without regard to historical forms of action or distinctions between law and equity. A modern system allows allegations to be made in general form and reads them indulgently; it allows allegations to be mutually inconsistent subject to the pleader's duty to be truthful. It permits considerable freedom of amendment and is willing to tolerate changes of direction in the course of litigation. Parties can resort to compulsory process besides private investigations to ascertain the facts surrounding the transaction, thereby measurably avoiding

surprise at the trial. The pretrial conference contributes to the same end of developing the whole case. The law of res judicata now reflects the expectation that parties who are given the capacity to present their "entire controversies" shall in fact do so.

\* \* \* \* \* \*

Because the transactional view set forth in this Section assumes as the present standard a modern system of procedure with the general characteristics described in this Comment, there is a need to allow exceptions to the general rule where the judgment is rendered in a jurisdiction whose procedural system has not been modernized, especially one where unification of law and equity has not been achieved. These exceptions are set forth in § 26(c).

Restatément (Second) of Judgments. § 24 comment a (1982). The exception to claim preclusion to which the Comment refers states:

When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:

\* \* \* \* \* \*

(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitation on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief
. . ..

Restatement (Second) of Judgments § 26(1)(c) (1982). The Comment to that subsection observes:

The general rule of § 24 is largely predicated on the assumption that the jurisdiction in which the first judgment was rendered was one which put no for-mal barriers in the way of a litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first.

The formal barriers referred to may stem from limitation on the competency of the system of courts in which the first action was instituted, or from the persistence in the system of courts of older modes of procedure—the forms of action or the separation of law from equity or vestigial procedural doctrines associated with either.

Restatement (Second) of Judgments, § 26 comment c (1982). We have no doubt, given the careful manner in which Pennsylvania has articulated its claim preclusion rule, that it would recognize the qualification in section 26(1)(c). Certainly no Pennsylvania case suggests otherwise.

Given that qualification, we are certain that the Pennsylvania Supreme Court would not treat the judgment in the Commonwealth Court as a *res judicata* bar to an action under 42 U.S.C. § 1981. First, it would not treat the Pittsburgh Human Relations Commission as if it were a court of record, because it is not. It would recognize that that local agency did not afford discovery, did not provide for compulsory process for witnesses, and was not bound by the rules of evidence. Thus it would have serious reservations about giving preclusive effect even to that agency's factfinding. Second, the Pennsylvania Supreme Court would recognize that as a creature of a city ordinance the Commission lacked subject matter jurisdiction to adjudicate a claim arising under any law except the ordinance, or to afford any remedy other than that authorized by the ordinance. Thus it would recognize that Ms. Davis not only was under no duty to tender her section 1981 claim for adjudication by that agency, but

that if she had done so, the agency could not lawfully have adjudicated it. It would recognize, as well, that the agency could not lawfully award attorneys fees, which were sought in this action and were awarded in the judgment appealed from. As to the proceedings on appeal in the Court of Common Pleas and the Commonwealth Court, the Supreme Court of Pennsylvania would recognize that the same limitations on the subject matter jurisdiction of the local agency would also prevent the adjudication of other causes of action in those courts on appeal. The Local Agency Law could not be plainer. In an appeal pursuant to that law the reviewing courts may consider only those causes of action which the local agency could and did adjudicate.

In an effort to obfuscate, the majority opinion treats the opinion of the Commonwealth Court not as what it is—a limited review of the decision of an agency with limited and specialized jurisdiction—but as if it were a primary adjudication. The opinion observes that "the court clearly concluded that the findings and record in the case were inadequate to support the conclusion that U.S. Steel had discriminated against Davis because of her race." (At 173). Even if that statement were accurate, it would not be dispositive on claim preclusion, for at best it would be a holding that Ms. Davis had failed to make a record before the agency which would support a claim under the ordinance. It would not justify treating the agency as if it had subject matter jurisdiction over causes of action arising under other laws. The legal tests for claim preclusion and for issue preclusion are not the same under Pennsylvania law (or under that of any other state), and it is improper to rely on a description of the court's determination of a factual issue to apply claim preclusion to causes of action which never were and never could have been litigated. The policy behind the claim preclusion rule, as the Second Restatement makes clear, is to encourage litigation of all claims in a single proceeding. That policy is inoperative with respect to local agency adjudications in Pennsylvania because they lack subject matter jurisdiction to entertain all claims. There is not even a reason for a rule requiring a litigant to make the best factual case before a tribunal which lacks jurisdiction to adjudicate all causes of action arising out of a transaction or series of transactions.

Worse, however, than the effort to obfuscate the distinction between claim preclusion and issue preclusion is the majority's patent misstatement of the holding of the Commonwealth Court. That court's opinion focused not on the *record* before the agency, but only upon the agency's *findings*. The opinion notes:

> In view of the fact that the lower [Common Pleas] court did not take any additional testimony or receive any additional evidence, our scope of review in this case is to determine whether the Commission abused its discretion or committed an error of law. *See Pittsburgh Press Employment Advertising Discrimination Appeal,* 4 Pa.Cmwlth. 448, 287 A.2d 161 (1972).

> We have carefully reviewed the record in this case, and we conclude that we must reverse because the Commission's findings of fact are not sufficient to support its conclusion that Section 8(a) of the Ordinance was violated.

*United States Steel Supply, Div. of U.S. Steel Corp. v. Pittsburgh,* 16 Pa.Cmwlth. 425, 428, 332 A.2d 871, 873–74 (1975). The court focused its attention upon the provision in the ordinance making it an unlawful employment practice to discriminate with respect to *discharge*. Compare Judge Van Dusen's description of Ms. Davis' Complaint. After quoting the findings, the Commonwealth Court observed:

> A careful reading of the Commission's findings, quoted above, leads us to conclude that they are not related to the offense which the Commission concluded took place. The findings offer no information concerning how the Supply Division discriminated "in dismissing Mrs. Davis" and therefore do not support the Commission's conclusion.

*Id.* at 430, 332 A.2d at 874–75. Quite plainly the Commonwealth Court's opinion proceeds upon one of two assumptions. It assumes either that the complaint before the Pittsburgh Human Relations Commission was confined to the February 2, 1970 discharge, or that section 8(a) of the ordinance, as a matter of law, reaches only discharges, not ongoing patterns of employment discrimination. Ms. Davis' complaint in the district court, as Judge Van Dusen observed, is considerably broader. The complaint to the agency, although it is not a part of the record on appeal since it was not included as an *exhibit in the preclusive pretrial stipulation*, is nevertheless included in the appendix. (4a). It refers not only to Ms. Davis' discharge, but also to racial harassment over three years and to the maintenance by USS of an atmosphere of racial intolerance. Thus assuming the agency complaint may properly be considered (which, on this record, we doubt), it suggests that the decision of the Commonwealth Court is predicated upon an interpretation of the ordinance as applicable only to discharges, not to long-term patterns of employment discrimination. Whatever the basis of the Commonwealth Court's decision, the majority's assertion that it "clearly concluded that the findings and *record* in the case were inadequate to support the conclusion that U.S. Steel had discriminated against Davis because of her race" (emphasis supplied) is a bold misdescription. That opinion does not analyze the record. It analyzes the agency's findings, and even without contesting most of them, concludes that they are insufficiently related to the February 2, 1970 discharge.

Our observations about the majority's misdescription of the Commonwealth Court decision are not particularly relevant on the *res judicata* issue, because, for the reasons set forth above, it is clear that neither Pennsylvania nor any other state would apply a rule of claim preclusion to a judgment vacating an order of a local municipal agency with limited subject matter jurisdiction and affording only limited procedural safeguards. If the issue of collateral estoppel were fairly presented by this record, what the Commonwealth Court decided might well be relevant. For the reasons set forth in Part III above, no collateral estoppel claim is before us, although the majority opinion quite unfairly suggests that it is. Issue preclusion—collateral estoppel— would require that we examine those findings of fact which were not set aside as clearly erroneous by the Commonwealth Court in order to determine whether any of them, applied against Ms. Davis, would bar relief on her federal court complaint, which Judge Van Dusen's earlier opinion fairly summarizes. The agency findings of fact, numbered, are set forth in the margin.[5] Of

**5.** 1. Mrs. Thelma B. Davis is a black female who was employed by the United States Steel Corporation on May 5, 1966.

2. Mrs. Davis had received her training at Connelly Vocational School, M.D.T.A. program, and was very highly recommended by her teachers for this employment.

3. Mrs. Davis took an examination, given by the Respondent, and appeared to possess all of the necessary skills for her future employment.

4. The United States Steel Supply Division of the United States Steel Corporation had never employed Negro personnel, either in clerical, secretarial, or any capacity other than laborers in the warehouse who performed menial jobs.

5. The first year of Complainant's employment went without major incident, but beginning in 1966 Complainant experienced difficulties with other employees and was the victim of name calling (i.e., racial slurs) and suffered damage to personal property, the only employee to experience such.

6. Complainant had, on several occasions, reported the incidents to her immediate supervisor but in all cases little or no credence was given them, with the word of the other employee taken for value.

7. Complainant experienced difficulties in the Flexograph Room and was transferred to the File Room but the difficulties continued.

8. On February 2, 1970, when Complainant went to the then acting manager to complain concerning damage to her boots, she was summarily dismissed from the employment of the United States Steel Supply Division.

9. The Complainant was dismissed on the spot and no apparent effort was made to determine the validity of her complaint of the incident.

10. Various employee conflicts apparently occurred in the office where Complainant worked and the supervisor and management appeared unable or unwilling to ameliorate

the ten findings, there is only one (No. 6) that the Commonwealth Court opinion actually describes as "not supported by the evidence," and then only after that finding is first described as "not related to the charge that a discriminatory discharge took place." All of the other findings of fact were accepted by the Commonwealth Court as supported by the evidence, but held to be irrelevant. 16 Pa.Cmwlth. at 430, 332 A.2d at 875. Certainly the one finding of fact which the Commonwealth Court obliquely suggested may not have been supported by the record is no basis for any collateral estoppel against Ms. Davis on a *factual* basis. The accepted findings all tend to support her section 1981 claim. On any fair reading, the Commonwealth Court decision cannot support factually based issue preclusion. As to any legally based issue preclusion, the Commonwealth Court never considered (1) whether or not the agency's findings of fact would support a charge under section 1981, or (2) whether the agency record would support such a charge. Only issues of fact or law actually litigated and determined by a valid final judgment are deemed conclusively determined in subsequent actions. Restatement (Second) of Judgments § 27 (1982). Thus, although on this record all that is properly before us is a *res judicata* or claim preclusion contention, and not a collateral estoppel or issue preclusion contention, the majority suggestion that collateral estoppel also bars Davis' section 1981 claim that she was subjected to an ongoing pattern of racial harassment culminating in her discharge is completely unsupportable as a matter of Pennsylvania law.

Moreover, even if the majority's description of the Commonwealth Court's opinion were fair, that court's decision that the record before the local agency was insufficient to support a conclusion that Ms. Davis had been discriminated against would not, as a matter of law, support a collateral

these employee problems. On investigation by Commission on Human Relations staff after the dismissal of the employee, it appeared that Complainant's records were kept in a different fashion than the records of

estoppel on the discrimination issue. The record here is different. It includes, besides the testimony taken before the local agency, an extensive deposition of Ms. Davis. At best the Commonwealth Court decision would estop her from claiming that, on precisely the same record which she presented to the agency and which was reviewed by that court, a court in a later proceeding could find discrimination.

B.

The majority's reliance on *Kremer v. Chemical Construction Corp.*, —— U.S. ——, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), is misplaced for several reasons.

In the first place, Justice White did not and could not instruct in that case on the law of Pennsylvania. He dealt, rather, with a specific provision in the New York Human Rights Law, not with the common law of *res judicata* of *any* state. Kremer's complaint was referred to the New York State Division of Human Rights, a statewide agency operating under a detailed statutory scheme radically different from the Pennsylvania Local Agency Law. N.Y. [Executive] Law §§ 290–301 (McKinney 1982). That agency has general rulemaking authority, authority to issue compulsory process, to confer immunity from criminal prosecution, to provide technical assistance to victims of discrimination, and even to obtain on request and utilize the services of all governmental departments and agencies. N.Y. [Executive] Law § 295. The substantive prohibitions which the agency enforces are in many respects broader than those in either section 1981 or Title VII of the Civil Rights Act of 1964. N.Y. [Executive] Law §§ 296, 296–a. Its procedures are regulated by statutory safeguards designed to assure a full and fair development of a record. N.Y. [Executive] Law § 297. The statute preserves the right of a person aggrieved by an unlawful discriminatory practice to resort to a court, rather than to the agency,

other employees, and letters involving other employees, critical of Complainant, were kept in the Complainant's file.
(276a–278a).

"for damages and such other remedies as may be appropriate." N.Y. [Executive] Law § 297(9). The provisions in the Human Rights Law for judicial review are far broader than those of the Pennsylvania Local Agency Law, for the New York Appellate Division "shall have the power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript an order enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part such order." Agency factfinding is reviewed by a "sufficient evidence" standard. N.Y. [Executive] Law § 298.

If an individual elects to institute such an action without resorting to the state agency "he may not subsequently resort to the procedure herein." But if he does resort to the agency, "the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned." N.Y. [Executive] Law § 300. It was the last quoted statutory provision, and only that, on which the *Kremer* Court relied, observing:

> There is no question that this judicial determination precludes Kremer from bringing "any action, civil or criminal, based upon the same grievance" in the New York courts. N.Y.Exec. Law § 300 (McKinney 1972).

—— U.S. at ——, 102 S.Ct. at 1890. There is no such Pennsylvania statute applicable

to local agencies.[6] The Supreme Court in *Kremer* was not dealing with common law principles of *res judicata*, but with a specific, detailed statutory scheme in which the New York legislature said expressly that a claimant did not have to resort to the agency, but if the claimant did so, that resort was a complete election of remedies. There is no such Pennsylvania legislation applicable to this case.[7]

It should be noted, moreover, that under the New York scheme the statutory election of remedies applies whether or not either party seeks judicial review, for under section 298 agency orders become final within thirty days, and section 300 refers to all final determinations. Yet in its discussion of 28 U.S.C. § 1738, the Supreme Court was quite careful to state that despite the finality language in the New York statute, Title VII did not require claimants to seek review of an unfavorable administrative action.[8] This explicit reiteration of settled Title VII caselaw makes it abundantly clear that the court did not hold that a state could apply *res judicata*—claim preclusion—to an agency determination even though the New York Human Rights Law purports to do so. The Court's holding is a narrow one. In *Kremer* the plaintiff elected to pursue the state agency remedy. Having lost before the state agency, the plaintiff could have sued in a federal court under Title VII (or under section 1981). He elected to proceed under section 298 of the New York Human Rights Law. That

---

6. *Compare* Pa.Stat.Ann. tit. 43, § 962 (Purdon 1964).

7. Since the Pittsburgh ordinance is not of record we do not know its terms, but USS has not suggested that it contains provisions similar to the New York Human Rights Law.

8. The Court wrote:
No provision of Title VII requires claimants to pursue in state court an unfavorable state administrative action, nor does the Act specify the weight a federal court should afford a final judgment by a state court if such a remedy is sought. While we have interpreted the "civil action" authorized to follow consideration by federal and state administrative *agencies* to be a "trial de novo," *Chandler v. Roudebush*, 425 U.S. 840, 844-845 [96 S.Ct. 1949, 1951 52, 48 L.Ed.2d 416]

(1976); *Alexander v. Gardner-Denver Co.*, supra, 415 U.S., at 38 [94 S.Ct., at 1015]; *McDonnell Douglas Corp. v. Green*, 411 U.S. [792] at 798–799 [93 S.Ct. 1817, at 1822–23, 36 L.Ed.2d 668] (1973), neither the statute nor our decisions indicate that the final judgment of a state *court* is subject to redetermination at such a trial.
—— U.S. at ——, 102 S.Ct. at 1891. Justice Blackmun, dissenting, also observed:
The Court, as it must, concedes that a state *agency* determination does not preclude a trial *de novo* in federal district court.... Congress made it clear beyond doubt that state agency findings would not prevent the Title VII complainant from filing suit in a federal court.
—— U.S. at ——, 102 S.Ct. at 1900.

court decided factual issues against him, and in those circumstances he is collaterally estopped from relitigating those issues. "Nothing in the legislative history of the 1964 Act suggests that Congress considered it necessary or desirable to provide an absolute right to relitigate in federal court an *issue* resolved by a state court." —— U.S. at ——, 102 S.Ct. at 1893 (emphasis supplied).

Juxtaposing the *Kremer* Court's explicit recognition of a Title VII claimant's right to bypass state judicial review with its observations about issue preclusion, it seems to us that the opinion cannot have any application to a case such as this, in which the claimant never was in a position to seek state court judicial review because she was not aggrieved by the agency action. The recognition that claimants need not resort to state judicial review demonstrates that the federal statutes do not contemplate a doctrine that would recognize transaction-wide claim preclusion as a result of an agency proceeding. If *Kremer* were to be construed to mean that whenever an agency afforded even the slightest relief, a respondent could drag the charging party into a state court and thereby achieve transaction-wide claim preclusion, the *Kremer* Court's clear premise that there was no obligation to present all claims or all facts to the agency would be undermined. An interpretation of Title VII and section 1738 which recognizes issue preclusion in those instances in which a claimant resorts to state court judicial review is a reasonable accommodation between conflicting federal policies favoring vindication of civil rights and state policies favoring finality of judicial determinations. Carrying the *Kremer* holding to the next stage, as the majority proposes, is unreasonable, inconsistent with Justice White's analysis, and dangerous. Not all localities are enthusiastic supporters of antidiscrimination legislation, and it will not take long for some local agencies to appreciate that all they have to do to deprive a claimant of a Title VII or section

1981 remedy in a federal court is to grant some scintilla of relief so that a respondent can drag the claimant into a state court. The effect of such practices would be that the only Title VII cases which ever reached the federal courts would be those in which the claim so lacked merit that the local agency did not afford even a scintilla of relief. At that point federal judges will, no doubt, complain to Congress that Title VII should be repealed so as to relieve their dockets of "junk" cases. It is inconceivable, given his express reendorsement of *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that Justice White intended such a result.[9] The majority obviously does. And as Judge Sloviter convincingly demonstrates, the majority position will inevitably result in by-passing the state conciliation effort, which Congress thought appropriate, for in every case in which a federal remedy other than under Title VII can be sought in a federal court no represented defendant should in the future make Ms. Davis' mistake.

Furthermore the majority's application of its misinterpretation of *Kremer* to a section 1981 action is entirely too glib. That statute and Title VII present quite distinct issues. As the *Kremer* opinions make clear, despite the language adopted by Congress in 1793, 28 U.S.C. § 1738 cannot be applied literally if such an application would interfere with the full and fair implementation of another federal statute or policy. That doctrine is well settled. *See United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (Indian Nations under tutelage of United States are immune to suit; immunity is not waived by failure to assert it; judgment subject to collateral attack); *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (state court judg-

9. *See also Patsy v. Board of Regents of the State of Florida*, —— U.S. —— , 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

ment of foreclosure and foreclosure sale void if rendered while a Frazier-Lemke Act petition is pending). It is embodied in the Restatement (Second) of Judgments §§ 26(c), (d) & 86, and would undoubtedly be recognized as a matter of Pennsylvania state law even if it were not, as it is, required by the Supremacy Clause.

The majority's reference to *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), in support of its application of *Kremer* to section 1981 cases does not advance the analysis. As the majority concedes, *Allen v. McCurry* involved 42 U.S.C. § 1983, which has a very different legislative history than section 1981. But a more significant distinction is that *Allen v. McCurry* involved only issue preclusion—collateral estoppel—not claim preclusion. Even with respect to section 1983 there is no suggestion that a litigant *must* submit all his claims, state and federal, to a state court or state agency growing out of a transaction or series of transactions. Claimants obviously cannot do so in criminal cases. Indeed the Court's approving reference to *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), confirms that state law with respect to claim preclusion does not determine the question whether federal law causes of action must be submitted to state courts. 449 U.S. at 101 n.17, 101 S.Ct. at 418 n.17. It is reconfirmed by *Patsy v. Board of Regents of the State of Florida*, —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), reiterating the rule that exhaustion of state administrative remedies is not a prerequisite for a section 1983 action. Thus *Allen v. McCurry* lends no support for an extension of the *Kremer* holding from Title VII cases to section 1981 cases. With respect to section 1981 two separate inquiries are necessary. The first is whether the initial tribunal had jurisdiction to adjudicate a section 1981 claim. If it did not, claim preclusion cannot apply. It is clear that the initial tribunal, the local agency, did not as a matter of Pennsylvania law have jurisdiction to adjudicate a section 1981 action or an application for attorneys fees under 42 U.S.C. § 1988. That alone is enough to prevent claim preclusion, for the jurisdiction of the Court of Common Pleas and the Commonwealth Court under the Local Agency Law is no broader than that of the underlying agency. There is also a question, thus far unresolved in this court and in the Supreme Court, whether as a matter of federal law any state court has jurisdiction to entertain a section 1981 action. If that is the case, obviously neither a claim preclusion rule nor an issue preclusion rule of state law could govern.[10] The question is not a simple one. As the majority concedes, section 1981 originated in the Civil Rights Act of 1866. Section 3 of that act provides:

> That the district courts of the United States, within their respective districts, shall have, *exclusively of the courts of the several States*, cognizance of all crimes and offenses committed against the provisions of this act, and also, concurrently with the Circuit Courts of the

---

10. *See* Restatement (Second) of Judgments § 86 (1982). The Restatement provides these illustrations:

> A Co. brings an action against B Co. in a state court under a state antitrust law and loses on the merits. It then commences an action in a federal court upon the same facts, charging violations of the federal antitrust laws, of which the federal courts have exclusive jurisdiction. The second action is not barred.

Section 26 comment c, illustration 2.

> W brings an action in state court against E, her employer, alleging that she was discharged from her employment on account of race, in violation of a state statute prohibiting discrimination in employment on account of race. Judgment is for E. W then brings an action in federal court, alleging that the discharge in question was in violation of a federal statute prohibiting discrimination in employment on account of race. The state court judgment does not preclude litigation of the federal claim if the federal statute contemplates that the federal claim may be asserted notwithstanding the adjudication in state court.

Section 86 comment d, illustration 1. *See also* Note, The Collateral Estoppel Effect of Prior State Court Findings in Cases Within Exclusive Federal Jurisdiction, 91 Harv.L.Rev. 1281 (1978); Note, Exclusive Jurisdiction of the Federal Courts in Private Civil Actions, 70 Harv.L. Rev. 509 (1957).

United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act . . . .[11]

The legislative history of that provision is hardly clear,[12] and the subsequent history of the statute perhaps less so.[13] It is at least uncertain whether any state court has jurisdiction to entertain a section 1981 action, and before the majority may blithely assume that a Pennsylvania claim preclusion rule can bar such an action, it is obliged, at least, to explore the question.

The second inquiry is whether, assuming the Pennsylvania courts have jurisdiction to adjudicate section 1981 actions, Congress intended in the Civil Rights Act of 1866 to create an exception to the predecessor of 28 U.S.C. § 1738. The majority addresses that issue, but its discussion entirely misses the mark. The 1866 statute provides for a right of removal "in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain cases' approved March three, eighteen hundred and sixty-three, and all acts amendatory thereof." [14] The 1863 Act provides in relevant part that "it shall be lawful in any such action or prosecution which may be now pending, or hereafter commenced, before any state court whatever, for any cause aforesaid, *after final judgment*, for either party to remove and transfer, by appeal, such case . . . from such court to the next circuit court of the United States to be held in the district in which such appeal shall be taken, in manner aforesaid." After removal, the "circuit court shall thereupon proceed to try and determine the facts and the law in such action, in the same manner as if the same had been there originally commenced, *the judgment in such*

*case notwithstanding.*" [15] (Emphasis supplied). The 1863 post-judgment new trial provision is as unambiguous an exception to the predecessor of 28 U.S.C. § 1738 as could be written. The 1866 Civil Rights Act incorporates that provision by reference. Thus it is absolutely certain that the 1866 Congress intended that the statute from which section 1981 is derived provide an exception to state law rules of *res judicata*. Contrary to the majority's conclusion (at 175) Congress plainly meant to render ineffective state civil judgments having to do with race discrimination.

The *post-judgment* removal feature of the 1866 Act is what the Court refers to in *Allen v. McCurry*, 449 U.S. 90, 99 n.14, 101 S.Ct. 411, 417 n.14, 66 L.Ed.2d 308 (1980). The majority quotes the footnote, but concludes:

The Court thus construed the 1866 Act as affecting the weight properly given to state judgments only if those judgments arose out of state proceedings that were defective.

(At 176). That conclusion is obscurant nonsense. Plainly in distinguishing section 1983, which derived from a different and later statute, the Court was contrasting the intention of the 1863 and 1866 Congresses to render ineffective all state judgments having to do with racial and Unionist discrimination. It is true that in the post-reconstruction era, when the Court began the process of emasculating the Civil Rights Acts, it construed the separate pre-trial removal provisions of the 1866 Civil Rights Act as requiring a showing that state procedures were on their face unfair. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880); *Virginia v. Rives*, 100 U.S. 313, 25 L.Ed. 667 (1880). Those cases, however, dealt with pre-judgment removal, which has no relevance whatever to *res judicata*.

11.  14 Stat. 27 (1866).

12.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess., 475–80, 598–600, 1123 ·25, 1155, 1161, 1271, 1366–67, 1679–81, 1758 59, 1782–83 (1866).

13.  *See* especially 16 Stat. 144 (1870); 17 Stat. 13 (1871); 18 Stat. 335 (1875); 18 Stat. 470 (1875), Revised Statutes of the United States, §§ 563, 629, 1977–79 (2d ed. 1878).

14.  14 Stat. 27 (1866).

15.  12 Stat. 757 (1863).

They had nothing to do with the post-judgment new trial feature of the 1866 and 1863 Acts, which were omitted in the Revised Statutes of 1874.[16] And no fair minded reading can construe the 1863 post-judgment new trial provision as anything but an absolute right to relitigate.

Since it is indisputable that Congress intended a *res judicata* exception in the 1866 Act, the only open question is whether, when the post-judgment removal provision was dropped from the Revised Statutes of 1874, Congress evidenced a positive intention to make actions under that statute subject to state *res judicata* rule for the first time. Section 5596 of the Revised Statutes provides:

> All acts of Congress passed prior to said first day of December one thousand eight hundred and seventy-three, any portion of which is embraced in any section of said revision, are hereby repealed, and the section applicable thereto shall be in force in lieu thereof; ... and all acts of Congress passed prior to said last-named day no part of which are embraced in said revision, shall not be affected or changed by its enactment.

The manner in which many statutes—the civil rights acts particularly—were distributed by the codifiers among various titles makes it difficult to apply section 5596 in particular instances. *See, e.g., Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979); *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). But given the general congressional intention to repeal only the prior statutes which were then codified, and leave other laws in effect, anyone trying to treat the Revised Statutes as a change in the congressional policy against giving state court judgments *res judicata* effect in section 1981 cases has the burden of persuasion. The majority opinion does not persuade us.

## V.

Since we do not join in the majority's *res judicata*-collateral estoppel reasoning or conclusion, it is appropriate to note that USS's alternative position is equally devoid of merit. USS contends that the trial court's findings of fact are clearly erroneous. The trial court performed the classic function of the factfinder: drawing inferences from conflicting evidence as to the ultimate facts in issue. Under the standards governing this court set forth in Fed. R.Civ.P. 52(a) we cannot substitute our inferences even if we were of a mind to do so. *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). We are not in any event of a mind to do so, for the trial court's conclusions are amply supported by the evidence and eminently reasonable.

## VI.

The majority has disregarded the record in this case, ignored a prior decision of this court made on an identical record, misstated the contents of the Commonwealth Court decision, confused the distinction under Pennsylvania law between claim preclusion and issue preclusion, misinterpreted the Supreme Court's decision in *Kremer v. Chemical Construction Corp.*, —— U.S. ——, 102 S.Ct. 1883, 72 L.Ed.2d 262 and misread the Civil Rights Act of 1866—all in an unsuccessful effort to justify the patently unjust result of depriving Ms. Davis of a judgment for money damages and attorneys fees to which the trial court properly found her entitled. We dissent.

SLOVITER, Circuit Judge, dissenting.

I believe, essentially for the reasons set forth in the dissenting opinion of Judge Gibbons, that the Pennsylvania Supreme

---

**16.** A possible explanation for the omission is the holding in *The Justices v. Murray*, 76 U.S. (9 Wall.) 274, 19 L.Ed. 658 (1870), that post-judgment removal and retrial of a case tried to a jury violates the seventh amendment. The review may have concluded that because the post-judgment appeal provision could no longer apply to cases tried to a jury, and most cases were so tried in the 1870's, the provision was not one of general application. The *Murray* holding does not bear upon the question whether Congress intended an exception to the predecessor of 28 U.S.C. § 1738, which enacts a non-constitutional rule of decision.

Court would not treat the judgment in the Commonwealth Court as res judicata so as to bar an action by Ms. Davis under 42 U.S.C. 1981 and that on this record there is no basis for application of any collateral estoppel against Ms. Davis. I also agree with Judge Gibbons that section 1738 should not be interpreted to preclude Ms. Davis' suit under section 1981. I write separately because I believe that in the scholarly discussion in the majority opinion and the irony of its result, public policy considerations which militate against the result it reaches are overlooked.

After her termination by U.S. Steel, Ms. Davis had various options. She could have immediately filed a section 1981 suit in federal court or she could have followed the administrative procedure necessary before filing a Title VII suit in federal court. She promptly chose to seek relief before the City of Pittsburgh Commission on Human Relations which is authorized to attempt to eliminate the alleged racial discrimination by means of private conferences or meetings with all parties. See section 13(e), Pittsburgh Human Relations Ordinance. The advantages of resorting in the first instance to a procedure whereby disputes may be resolved by conference, conciliation and persuasion are evident: an unrepresented claimant may seek and sometimes be awarded relief; the parties may informally resolve their differences without the bitterness engendered by litigation; and the courts are spared the additional burden of yet more lawsuits.

Had Ms. Davis chosen to pursue her Title VII remedy, prior resort to either the state or the local Commission on Human Relations would have been mandatory. The decision of that agency, even if unfavorable to Ms. Davis, would not have precluded her Title VII suit in federal court, see Kremer v. Chemical Construction Corp., —— U.S. ——, ——, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982), and presumably would not have precluded a section 1981 suit in federal court, unless she had chosen to appeal to the state courts.

Ironically, Ms. Davis was not unsuccessful in her claim before the administrative tribunal. Indeed, the PCHR ordered U.S. Steel to cease and desist from racial discrimination, to reinstate Davis and to award her backpay. Thereafter, according to the logic of the majority opinion, the die was cast. Her well-financed employer appealed, first to the Allegheny County Court of Common Pleas, and when unsuccessful there, continued the appeal process to the Commonwealth Court where, at this third stage, it received a favorable decision. According to the majority, this decision by the Commonwealth Court now bars Ms. Davis' suit in federal court for race discrimination in employment under section 1981.

Had Ms. Davis been unsuccessful before the local agency, U.S. Steel could not have appealed to the state courts and Ms. Davis could have proceeded as she did by filing her section 1981 suit in federal court and would not be deprived of the $50,736.11 judgment awarded her by the district court because of the Commonwealth Court decision. On the other hand, had Ms. Davis bypassed the state or local administrative procedure entirely and filed her section 1981 suit immediately in federal court, she would not be deprived of the $50,736.11 judgment awarded her by the district court because of the Commonwealth Court decision. Therefore, because she sought to utilize the informal procedure which the State of Pennsylvania provides for persons who believe themselves to be victims of racial discrimination, because she chose to conciliate rather than litigate in the first instance, and because she was successful in that effort, thereby giving U.S. Steel the opportunity to invoke the jurisdiction of the Pennsylvania courts, Ms. Davis will lose the $50,736.11 judgment awarded to her by the district court.

This leads to the patently unsatisfactory conclusion that complainants will be well-advised to bypass the state administrative machinery. I cannot believe that any of the legislative history utilized by the majority in discussing public policy can mandate this result. The courts and judges of this country, from the Chief Justice of the Unit-

ed States down, have repeatedly spoken of the need to seek dispute resolution mechanisms outside of litigation. There is also a public policy, reflected in various statutes requiring initial resort to state administrative procedures, to use that procedure whenever possible. The majority opinion, howsoever logical on the surface, will instruct claimants in Ms. Davis' position to file their claims as suits under section 1981 directly in federal court, which, it appears to me, contravenes current public policy. I dissent from this example of what one of our colleagues frequently refers to as "mechanical jurisprudence." *See United States v. Jannotti*, 673 F.2d 578, 615 (3d Cir. 1981) (Aldisert, J., dissenting).